### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**CHAVA RACHEL MARK**, individually and as parent
and natural guardian of TBM, RLM and EBM, minors;
**TBM**, minor, by her mother and natural guardian;
**RLM**, minor, by her mother and natural guardian; **EBM**,
minor, by her mother and natural guardian; **NETANEL
MARK**; **ESTATE OF DAVID SHLOMO MARK**, by
and through its administrator, Yisca Mark; **SHIRA
MARK HARIF; YEHOSHUA MARK; MIRYAM
MARK; ORIT MARK ETTINGER; PDAYA MARK,
AYELET BATT; ARYEH BATT; AVRAHAM
BATT;** and **ELISHEVA HIRSHFELD**,

Civ. No. 20-civ-_____

Plaintiffs,

vs.

**THE ISLAMIC REPUBLIC OF IRAN**,

Defendant.
_____/

### COMPLAINT

Plaintiffs, by counsel, bring this action for damages against Defendant, the Islamic

Republic of Iran, and allege as follows:

### INTRODUCTION

1.      This is a civil action brought pursuant to the "Terrorism Exception" to the Foreign

Sovereign Immunities Act, 28 U.S.C. § 1605A (the "FSIA"), seeking damages for wrongful

death, personal injury, and related torts, that resulted from a terrorist drive-by shooting attack

(the "Terrorist Attack" or the "Attack") carried out by Hamas – The Islamic Resistance

Movement (a/k/a "Harakat al-Muqawamah al-Islamiyya") ("Hamas"), an entity designated by

the United States government as a Specially Designated Terrorist ("SDT"), a Foreign Terrorist

Organization ("FTO"), and a Specially Designated Global Terrorist ("SDGT").

2.      On Friday, July 1, 2016, Rabbi Michael "Miki" Mark was driving with his wife, Chava, and two of their children on a quiet country highway in Israel when two Hamas gunmen overtook their car and sprayed machine gun fire at the Mark family. Rabbi Mark was killed in the attack. His wife, Chava, was critically wounded and continues to suffer from permanent brain injuries and the loss of one eye.

3.      The two Mark children who were accompanying their parents were also injured in the shooting. Their minor daughter, TBM, suffered gun shot wounds to her stomach, and their son, Pdaya, was injured in the ensuing crash.

4.      Defendant, the Islamic Republic of Iran ("Iran"), provided Hamas with material support and resources, authorized and ratified the actions of its officers, employees and agents described herein, and took other actions that facilitated, enabled, and caused the Terrorist Attack.

5.      This action is brought by Rabbi Mark's widow, Chava Mark, who was, herself, grievously injured in the Attack; Michael and Chava Marks' nine surviving children, including the two who were also injured in the Attack; the estate of the Marks' son, David Shlomo Mark, who died in a traffic accident in 2019; and the mother, brothers, and sister of Chava Mark. All of the plaintiffs suffered serious physical and/or emotional injuries as a result of the Attack, the death of Rabbi Mark, and the serious, permanent injuries suffered by Chava Mark, Pdaya Mark, and TBM.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter and over the defendant pursuant to 28 U.S.C. §§ 1330, 1331, 1367 and 1605A.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f).

**THE PARTIES**

8.     Plaintiff Chava Mark sustained severe, permanent, life-altering head and brain injuries in the Attack. She also suffered and continues to suffer the loss of her husband and father of her ten children. Chava Mark is a United States national.

9.     Plaintiff Chava Mark brings this action individually and as parent and natural guardian of her minor children, TBM, RLM, and EBM.

10.     The Marks' son Pdaya, who was a minor at the time of the Attack, and their daughter, TBM, also a minor at the time of the Attack and still today, were riding in the car with their parents. Both witnessed their father's murder and saw their mother critically injured in the Attack.

11.     TBM sustained gun shot wounds to her stomach, and Pedaya was injured when the family's car overturned and crashed after the shooting.

12.     Plaintiff Pdaya Mark is a United States national. He is a son of Michael and Chava Mark and a sibling of TBM.

13.     Plaintiff TBM is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya Mark.

14.     Plaintiff RLM is a minor child of Michael and Chava Mark and a sibling of Pdaya Mark and TBM. She is a United States national.

15.     Plaintiff EBM is a minor child of Michael and Chava Mark and a sibling of Pdaya Mark and TBM. She is a United States national.

16.     Plaintiff Netanel Mark is a United States national. He is a son of Michael and Chava Mark and a sibling of Pdaya and TBM.

17.     Plaintiff Yehoshua Mark is a United States national. He is a son of Michael and Chava Mark and a sibling of Pdaya and TBM.

18.     Plaintiff Shira Mark Harif is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya and TBM.

19.     Plaintiff Miryam Mark is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya and TBM.

20.     Plaintiff Orit Mark Ettinger is a United States national. She is a daughter of Michael and Chava Mark and a sibling of Pdaya and TBM.

21.     Plaintiff David Shlomo Mark was  a son of Michael and Chava Mark and a sibling of Pdaya Mark and TBM.. He tragically died in a traffic accident in 2019. David Shlomo Mark was a United States national.

22.     Plaintiff the Estate of David Shlomo Mark brings this action through Yisca Mark, the widow of David Shlomo Mark and the administrator of the Estate of David Shlomo Mark.

23.     All of the Mark children suffered and continue to suffer from the loss of their father and the severe, incapacitating, and permanent injuries sustained by their mother, and the injuries suffered by Pdaya Mark and TBM, their brother and sister, respectively.

24.     Plaintiff Ayelet Batt is the mother of Chava Mark and grandmother of all of the Mark children. She is a United States national.

25.     Plaintiff Aryeh Batt is a brother of Chava Mark. He is a United States national.

26.     Plaintiff Avraham Batt is a brother of Chava Mark. He is a United States national.

27.     Plaintiff, Elisheva Hirshfeld is the sister of Chava Mark. She is a United States national.

28.     Plaintiffs Ayelet Batt, Aryeh Batt, Avraham Batt, and Elisheva Hirshfeld suffered and continue to suffer from the severe, incapacitating, and permanent injuries sustained by their daughter and sister, Chava Mark.

29.     Defendant the Islamic Republic of Iran is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified the actions of its officers, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attack and the harm to the plaintiffs herein.

## FACTS

### A. Hamas is a radical terrorist organization that publicly and proudly executes terrorist attacks against civilians.

30.     Hamas is a radical terrorist organization that openly declares its goals of creating an Islamic state covering the entire territory of Israel, the West Bank and the Gaza Strip, as well as the destruction of the State of Israel and the murder or expulsion of its Jewish residents. Hamas seeks to achieve these goals by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank and the Gaza Strip. Hamas proudly and openly acknowledges that it uses terrorism to achieve its political goals. Hamas uses terrorism to coerce, intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

31.     To illustrate Hamas's brutality, in the last two years the organization has engaged in an ongoing assault on Israeli border communities using Improvised Explosive Devices

("IEDs") attached to colorful balloons, kites, and other child-friendly objects such as books and soccer balls. The apparent murderous intent behind these devices is to lure Israeli children and others to the explosives only to have them explode upon contact[1].

32. Continuously since 1995, and at all times relevant to this litigation, Hamas has been designated by the United States as a Specially Designated Terrorist ("SDT"). Continuously since 1997 and at all times relevant to this litigation, Hamas has been listed by the United States Department of State as a Foreign Terrorist organization ("FTO")[2]. Continuously since 2001, and at all times relevant to this litigation, Hamas has been listed pursuant to Executive Order No. 13224 as a Specially Designated Global Terrorist ("SDGT")[3].

33. Since 2003, United States courts have reached and published numerous decisions finding that Hamas was responsible for terrorist attacks in which United States citizens were killed and injured. See e.g., *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003); *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232 (D.R.I. 2004); *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90 (D.D.C. 2006); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 212 (D.D.C. 2008); *Goldberg-Botvin v. Islamic Republic of Iran, 938 F. Supp. 2d 1 (D.D.C. 2013)*; *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017); *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107 (D.D.C. 2018); *Weinstock v. Islamic Republic of Iran*, Civil Action No. 17-23272-Civ, 2019 U.S. Dist. LEXIS 75532 (S.D. Fla. May 6, 2019).

34. Hamas does not act alone. United States courts have also held the Islamic Republic of Iran directly responsible for such attacks by Hamas because of its provision of

---

[1] See https://www.timesofisrael.com/palestinians-in-gaza-launch-balloons-carrying-rpg-warhead-into-israel/ lat visited February 9, 2020.
[2] See https://www.state.gov/j/ct/rls/other/des/123085.htm last visited February 6, 2020.
[3] See https://www.treasury.gov/ofac/downloads/sdnlist.pdf, last visited February 6, 2020.

material support and resources to Hamas. *See e.g.* cases cited in the previous paragraph. As required under the Foreign Sovereign Immunity Act, Defendant Iran was served with numerous complaints and judgments finding it liable for terrorist attacks by Hamas. Moreover, Iran has selectively litigated some of these cases in United States courts. *See e.g.*, *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1320 n.5 (2016) (listing the judgments being enforced and including certain judgments that were based upon Iranian support for Hamas terrorism); *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) (judgment enforcement against Iran based upon Iranian support for Hamas terrorism).

35.     Thus, Hamas's practice of carrying out terrorist attacks like the Terrorist Attack, and its multiple designations as a terrorist organization, were and are well known to the public at large, including the Defendant Iran. With knowledge of Hamas's terrorist goals and with the deliberate intent to further those goals, Iran provided material support to Hamas for use in terrorist attacks including the Attack upon the Mark family. Iran's active role in Hamas terrorism is further detailed below.

**B.  Hamas Operatives Prepared for the Attack.**

36.     In March or April of 2016, Hamas operative, Muhammed Jbara Fakia ("Fakia"), approached fellow Hamas operative Muhammed al-Amarya ("al-Amarya") and enlisted his assistance acquiring weapons for use in terrorist attacks against Israelis.

37.     According to Israeli intelligence and law enforcement records, Fakia had previously been a member of Palestinian Islamic Jihad, another Iran-sponsored designated terrorist group. However, while serving time in an Israeli prison for prior terrorist activities, Fakia left the PIJ and joined Hamas.

38.     Al-Amarya had previously been convicted by the Israelis in 2008 for illegally trading in military weapons, discharging weapons towards a person, and for membership in a terrorist organization. He was released from prison in 2011 pursuant to a prisoner exchange deal between Israel and Hamas.

39.     Fakia and al-Amarya both lived in the town of Dura, near Hebron.

40.     Al-Amarya purchased a Kalashnikov assault rifle and bullets for 38,000 New Israeli Shekels, which was the equivalent of slightly more than $10,000. Fakia and al-Amarya began training with the weapon and another that Fakia had already acquired.

41.     In May 2016, Fakia told his brother Sahib, who was also a member of Hamas, about his plans to carry out an attack against Israeli civilians. Sahib assisted Fakia by purchasing elbow and knee pads, face masks, and two military uniforms. Fakia told Sahib that he had amassed an arsenal of nine firearms and five Kalashnikov magazines, fully loaded with bullets.

42.     At around the same time, Fakia approached Ala'ah Ra'ad Salah Zagayer ("Zagayer"), and requested that Zagayer acquire a video camera, films of Hamas leaders, Hamas flags, and two military uniforms. Zagayer later stated that he understood that Fakia was planning a terrorist attack and wanted to film his last will before the operation. Zagayer helped Fakia obtain the requested items.

43.     Fakia owned a  car – a Hyundai. However, he wanted to use a different car in the Attack – one that would be more difficult to trace. Accompanied by Zagayer, Fakia purchased an Opel.

44.     Approximately three weeks before the Attack, Fakia told Zagayer, that Fakia's superiors instructed him to find someone to replace him following his death. Zagayer recommended a friend of his, but Fakia said he preferred a different candidate.

45.     Shortly thereafter, Fakia told his brother, Sahib, that he was ready to carry out the Attack. However, Fakia received orders from leaders of Hamas's military wing, the Izz ad-Din al-Qassam Brigades, directing him to postpone the Attack due to an expected flare-up with Israel in Gaza.

46.     Fakia requested that his brother hide the weapons. The brothers disassembled the guns and cleaned them. Sahib kept them in his house at night, and Fakia took them out during the day.

47.     While Fakia and al-Amarya waited for instructions from Hamas leadership to proceed with the attack, they continued their training and intelligence gathering.

48.     Fakia would dress in an Israeli army uniform while another person, dressed as an Israeli settler. In these disguises the two were able to move about freely in areas under Israeli control and search for an appropriate location for their planned Attack.

49.     Approximately one week before the Attack, Fakia asked Zagayer to deliver a message for him. Fakia handed Zagayer a note and instructed him to go to the al-Kharas Mosque in Hebron. Zagayer was to remove his shoes (as is the Muslim custom before prayer), leave them on a particular shelf, and to place the note inside one of the shoes. Fakia told Zagayer that someone would collect the note from the shoe.

50.     Zagayer proceeded as instructed, but he forgot where he was supposed to place the note. When he returned with the note, Fakia told him he must return as people were waiting for the note.

51.     Zagayer again did as instructed. On the way, he read the note and saw that it said: "Surveillance has been performed on the target. The operation must be this Friday."

52.    Zagayer delivered the note as instructed and waited until another man removed the note from the shoe and placed a different note in the shoe.

53.    Zagayer took the second note with him and returned to Fakia. But before he delivered the note to Fakia, Zagayer read it. This note said: "We want to see you on Tuesday following the afternoon prayers at the *al Ahali* Mosque in Hebron."

54.    Zagayer understood that Fakia was planning to carry out an attack the following Friday.

55.    When Zagayer presented the return-note to Fakia, the latter read the note, tore it into pieces, and threw it out of the window.

56.    Approximately three days before the Attack, Fakia told his brother that due to the concern that the Israelis would arrest him before he would have a chance to carry out the Attack, Hamas officials had authorized him to proceed.

57.    Fakia asked Zagayer to arrange for him an apartment where Fakia could film his last will while dressed in a military uniform and standing next to Hamas flags.

58.    Fakia and al-Amarya attempted three times to carry out a drive-by shooting attack. However, they were unable to identify an appropriate target. Exhibiting discipline, they decided to bide their time.

59.    On July 1, 2016, Sahib saw Fakia dressed in black military style pants and army boots. Fakia told Sahib that he was going to carry out the Attack that day.

60.    Sahib escorted his brother to the car. Al-Amarya was driving Fakia's Hyundai. After the Attack, Fakia would tell Zagayer that he used the Hyundai because it could accelerate faster than the Opel he had purchased for use in the Attack.

61.     Fakia asked Sahib to bring him the elbow pads, which he did. Sahib also noticed that Fakia had obtained an Israeli license plate.

62.     Fakia and al-Almarya drove to a local school where they removed the Palestinian license plate and replaced it with the Israeli plate. Then they drove out of Dura looking for an appropriate target.

**C. The Terrorist Attack.**

63.     On July 1, 2016, Rabbi Michael Mark, his wife, Chava, and two of their ten children were driving to Jerusalem to visit Rabbi Mark's mother.

64.     As they drove on the two-lane road, Fakia and al-Amarya followed them for a number of minutes. Al-Amarya was driving and Fakia was seated in the passenger seat.

65.     Fakia instructed al-Amarya to pull alongside the family's car. Al-Amarya veered into the left lane and accelerated until the Hamas car was next to the Mark's vehicle. Fakia opened fire with a Kalashnikov assault rifle, shooting at the Mark family from a distance of approximately 2 meters.

66.     In a matter of seconds, the Hamas terrorists fired approximately 25 bullets into the Marks' car. Five bullets stuck Rabbi Mark's body and one bullet penetrated his head.

67.     Michael Mark lost control of the car, which flipped on its top before coming to a crashing halt.

68.     Chava Mark also sustained bullet wounds to her head. When the car stopped moving she was unconscious, still strapped into her seat, upside-down. Chava was critically injured and remained in a coma for several days, unable to attend her husband's funeral. Chava has undergone multiple brain surgeries and lost an eye as a result of her injuries. She continues to suffer from her permanent and serious injuries.

69.     The children, Pdaya and TBM were both injured, but remained conscious. TBM had been shot in the stomach. Pdaya was injured in the crash. The children saw their parents unresponsive and believed that they had both been killed in the shooting. The children could not extricate themselves from the car. They remained in the car, helpless; both injured, knowing their parents could not save them.

70.     The Hamas terrorists performed a U-turn and drove back to where the Marks' car had stopped. Al-Amarya would later confess that they wanted to ensure that all occupants of the car were dead.

71.     Fakia approached and fired again into the Marks' car. However, al-Amarya noticed that other vehicles were coming, and called for Fakia to quickly return to the car so they could escape.

72.     On their way back to Dura, Fakia told al-Amarya that upon his return to the victims' over-turned car he saw the two children alive in the back seat. The terrorists expressed their disappointment that they had to flee and were unable to kill the children.

73.     The Hamas operatives returned to the school and switched their car's license plate from the Israeli tag back to the Palestinian original. They threw the Israeli plate in the garbage.

74.     Fakia and al-Amarya each took one of the Kalashnikovs with them and they parted ways.

75.     At al-Amarya's trial, the Israeli court found that he had acquired the two Kalashnikovs and the bullets used in the attack. One of the weapons used in the attack was the one al-Amarya purchased for Fakia with 38,000 New Israeli Shekels. Al-Amarya and Fakia had trained with the weapons during the months leading up to the attack. Al-Amarya was convicted

of premeditated murder, several counts of attempted murder, dealing in military equipment, and illegal possession of weapons.

76.     Immediately after the Attack, a Palestinian couple came upon the scene of the Marks' over-turned vehicle. They stopped to help the victims. The couple pulled the frightened and injured children from the car.

77.     The man stood by the road trying to flag down additional help, while his wife, who was a trained nurse, tended to the children.

78.     Within minutes a Palestinian doctor and his brother stopped to help as well. The doctor determined that Rabbi Mark was dead. But they pulled Mrs. Mark from the car. She had been choking due to the position of her seatbelt.

79.     Other Palestinians passed in their vehicles. Some of them threatened the heroic rescuers who continued to tend to the Mark family until an ambulance arrived and evacuated the victims to a hospital.

80.     Intelligence agencies and the Israeli army confirmed that the attack had been perpetrated by two Hamas cells. Following the Attack, Israeli intelligence discovered Hamas infrastructure in the West Bank that led them to the trigger-man, Fakia, who was hiding in a Palestinian village near Hebron.

81.     Israeli security officials captured the driver, al-Amarya, alive. He confessed to his role in the Attack and provided details thereof to the Israeli investigators. Al-Amarya was tried and convicted for his role in the Terrorist Attack.

82.     Three weeks after the Attack, Israeli forces surrounded the house in which Fakia was hiding. The Israeli forces called for Fakia's surrender, but the Hamas operative responded

with gunfire and explosives. After a 7-hour stand-off, during which the Israeli security forces

razed the house, Fakia's death was confirmed.

83.     Hamas was furious with the Palestinian Authority (the "PA") due to its refusal to

prevent or otherwise interfere with the Israeli raid. Fakia's family, some of whom were also

known members of Hamas, accused the PA of informing Israel of Fakia's location.

84.     Hamas praised Fakia as a hero and a martyr, and explicitly claimed credit for the

"successful operation," meaning the Terrorist Attack on the Mark Family.

85.     In speeches and in writing, Hamas leaders individually praised Fakia as a hero

and a martyr.

86.     Hamas-controlled radio stations, web sites, and other media similarly praised

Fakia as a Hamas hero and martyr.

87.     Statements by Fakia's co-conspirators confirmed that leaders of the Hamas

military wing, the Izz ad-Din al-Qassam Brigades had planned and ordered the Attack.

**D.  Iran provided material support to Hamas.**

88.     Since the 1979 Iranian Revolution, Iran has been ruled by a series of governments

deeply hostile to the United States and to Israel.

89.     Since 1984 until the present time, Iran has been continuously designated by the

United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the

Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

90.     During all periods relevant to this suit, it has been the continuous and official

policy of Iran to use terrorism against the United States and its allies, including Israel, to advance

its interests both domestically and abroad. By providing material support and resources to

terrorist organizations, Iran is able to enlist these terrorist proxies to carry out attacks against the

United States and Israel, and advance Iranian interests around the world. Iran exploits its support for terrorist organizations to obtain leverage with other countries, either "punishing" them or obtaining concessions from them.

91.     Additionally, Iran utilizes its support of international terrorism to attempt to (a) intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically and politically and (b) intimidate and influence the Israeli government and public and thereby seek to bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

92.     Towards these ends, Iran has provided massive material support and resources to numerous anti-American and anti-Israel terrorist organizations, including Hamas, which shares Iran's violently anti-American and anti-Israel ideology.

93.     During the period relevant hereto, Iran provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack.

94.     Such support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Iran, in order to assist Hamas achieve goals shared by Iran. These goals included terrorizing the Jewish civilian population in Israel, weakening Israel's economy, social fabric, and military strength and preparedness, and harming Israel's allies and supporters, especially the United States.

95.     Iran provided the material support and resources through its security and intelligence agencies. These security and intelligence agencies included primarily, but without

limitation, the Islamic Revolutionary Guard Corps ("IRGC"), and a subdivision of the IRGC known as the Islamic Revolutionary Guard Corps-Quds Force ("IRGC-QF").

96.     Iran provided Hamas with the material support and resources through officers, employees, and agents of Iran who worked in or with the IRGC and the IRGC-QF. These Iranian officers, employees, and agents included without limitation: Mohammad Ali Jafari, Qasem (or Ghassem) Soleimani, and Hossein Hamadani (collectively below: "Iranian Officials").

97.     In addition, at all times relevant hereto, Iran and the Iranian Officials provided Hamas with the material support and resources by and through the agency of the Hezbollah terrorist organization and other Iranian-supported terrorist groups and terrorist operatives (collectively below: the "Iranian Agents"), which and who received material support and resources from Iran and the Iranian Officials for the purpose of providing material support and resources to Hamas, and which acted as agents and proxies of Iran and the Iranian Officials for that purpose. The Iranian Officials and the Iranian Agents are collectively referred to below as Iran's "Officials and Agents."

98.     The material support and resources that were provided to Hamas by Iran and its Officials and Agents in the years immediately prior to the Terrorist Attack for the purpose of facilitating acts of extrajudicial killing and terrorism included inter alia: provision of financial support to Hamas; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to Hamas; provision of military-grade explosives, military firearms and other weapons and matériel to Hamas; provision of access to training bases and military facilities in which terrorist training was provided to Hamas and its operatives; provision to Hamas and its leaders and operatives of safe haven and refuge from capture; provision to Hamas of electronic communications equipment and access;

provision to Hamas of financial services, including banking and wire transfer services; and provision to Hamas of means of transportation, including providing leaders and operatives of Hamas passage on Iranian-owned aircraft to allow them to avoid detection and carry out further terrorist attacks.

99.     Iranian financing and training was instrumental in enabling and establishing a train-the-trainer program, which enabled Hamas to send a number of its agents abroad for training by Iranian or Hizbollah agents. These Hamas agents would then return to the West Bank or Gaza and train others.

100.     Iran and its Officials and Agents gave substantial aid and assistance to Hamas, and provided the massive material support and resources described above to Hamas, and thereby aided and abetted Hamas, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack. Iran and its Officials and Agents did so with actual knowledge that Hamas had killed and injured numerous U.S. citizens in terrorist attacks and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their aiding, abetting, and provision of material support and resources to Hamas.

101.     Iran and its Officials and Agents knowingly and willingly conspired, agreed and acted in concert with Hamas, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, including the Terrorist Attack. Iran and its Officials and Agents did so with actual knowledge that Hamas had killed and injured numerous U.S. citizens and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with Hamas.

102.    At all times relevant hereto, IRGC and the IRGC-QF were agencies, instrumentalities and/or offices of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran and within the scope of their agency and office, within the meaning of 28 U.S.C. §1605A(a)(1) and 28 U.S.C. §1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that IRGC and the IRGC-QF implemented and acted as conduits and instrumentalities for Iran's provision of funds, terrorist training, and other material support and resources to Hamas for the commission of acts of extrajudicial killing including the Terrorist Attack.

103.    Iran authorized, ratified and approved the actions of IRGC and the IRGC-QF described herein, and is therefore both directly and vicariously liable for those actions.

104.    At all relevant times, Iran's Officials and Agents were officers, employees, and/or agents of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that  Iran's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Iran to Hamas for the commission of acts of extrajudicial killing including the Terrorist Attack.

105.    Iran authorized, ratified and approved the actions described herein of its Officials and Agents, and is therefore is directly and vicariously liable for those actions.

106.    Since at the latest 1993, Iran has been the primary supporter of Hamas, providing financing, training, weapons, logistical support, and other forms of material support for Hamas.

107.    Also in 1993 Hamas and Islamic Jihad joined the Damascus-based Alliance of Palestinian Forces. In 1995, Hamas and Islamic Jihad established an operational headquarters in

Damascus, and at the request of Iran, and with the help of Iran's proxy Hizbollah, began coordinating their terrorist activities.

108.    In 2000 Ayatollah Ali Khameni said, "The Palestinian people must continue the blessed Jihad and standing against the enemies of Islam...The Hamas, Islamic Jihad and Fatah forces must continue the struggle in a united way. Indeed, the only solution is the elimination of the root of this crisis, which is the Zionist regime imposed on the region." (emphasis added).

109.    Relations between Iran and Hamas cooled somewhat due to Hamas's initial refusal to support the Assad regime in Syria during the early years of that country's civil war. However, by 2013-2014 Iran had increased again its substantial support for Hamas, including provision of financing, training, weapons, and logistical support.

110.    By 2015 Iranian support for Hamas was fully restored. And in January 2016 Ahmed Yousef, a Hamas leader confirmed that despite a temporary reduction in aid for Hamas as a whole, Iran had never stopped supporting Hamas's military wing, the Izz ad-Din al-Qassam Brigades.

111.    In a 2015 book, *Terrorism, Inc.: The Financing of Terrorism, Insurgency, and Irregular Warfare* (Santa Barbara, CA: Praeger Security International, 2015), Dr. Colin Clarke, a RAND Corporation political scientist, observed that while Saudi Arabia was reducing its significant financial support for Hamas, "much of this has been made up from Tehran, now a major state sponsor even though Iran is a Shia nation and Hamas is a Sunni militant group."

112.    The State Department's Country Reports on Terrorism, 2017 ("CRT 2017"), found that "Iran continued to provide weapons, training and funding to Hamas and other Palestinian terrorist groups…. These Palestinian terrorist groups have been behind a number of deadly attacks originating in Gaza and the West Bank…." CRT 2017 at 218.

113.    As recently as  2017 and 2018. reports in the Iranian press discuss joint meetings in Tehran including Iran, Hizbollah, Hamas, the Palestinian Islamic Jihad ("PIJ"), and the Popular Front for the Liberation of Palestine ("PFLP"), at which the parties stressed the need for joint action to escalate violent acts of terrorism.

114.    A Lebanese daily newspaper reported that "these elements are currently forming a war room to coordinate a joint reaction against Israel and against Trump's announcement [to move the United States Embassy in Israel to Jerusalem]."

115.    In an October 2017 statement, President Trump affirmed that Iran "remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks.

116.    Thus, a terrorist conspiracy was established and continues to this day, with Iran at the hub and having the violent annihilation of Israel as its goal

**FIRST COUNT**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**

117.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

118.    Iran is a foreign state that, since 1984, has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

119.    Iran provided to Hamas material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

120.    Iran conspired with Hamas to carry out the Terrorist Attack.

121.    IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist

Attack, and conspired with Hamas to carry out the Terrorist Attack, all within the scope of their agency and office.

122.    Iran's Officials and Agents are officers, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

123.    Hamas is, and was at the time of the Attack, an agent of Iran, and it carried out the Terrorist Attack while acting within the scope of its agency.

124.    The Terrorist Attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

125.    Decedent Rabbi Michael Mark was murdered in the Terrorist Attack. The murder of Rabbi Mark caused plaintiffs Chava Mark, Netanel Mark, Pdaya Mark, TBM, RLM, EBM, Yehoshua Mark, Shira Mark Harif, Miryam Mark, Orit Mark, David Shlomo Mark, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

126.    Plaintiff Chava Mark was shot in the head and severely and permanently injured in the Attack. She was placed in extreme fear of immediate death or serious physical injury for herself, her husband, and her children Pdaya and TBM, who were also in the car. Chava Mark witnessed the terrorists murder her husband, among many other horrifying sights, and suffered severe physical, emotional and other injuries as a result, including: bullet wounds, disfigurement, loss of physical and mental functions, and the loss of one eye. Chava Mark was required to undergo multiple surgeries and to endure extreme pain and emotional suffering, loss of guidance,

companionship and society, loss of consortium, loss of solatium, and pecuniary loss and loss of income.

127.    Plaintiff Pdaya Mark was injured in the Attack and ensuing crash. He was placed in extreme fear of immediate death or serious physical injury for himself, his parents and his sister. Pdaya Mark witnessed his father's murder and his mother's and sister's grievous injuries. Plaintiff Pdaya Mark suffered severe harm as a result of the Terrorist Attack, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium.

128.    Plaintiff TBM suffered gunshot wounds to her stomach and other injuries during the Attack. She was placed in extreme fear of immediate death or serious physical injury (for herself, her parents and her brother). TBM witnessed her and father's murder and her mother's grievous injuries. Plaintiff TBM suffered severe harm as a result of the Terrorist Attack, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium.

129.    The death of Michael Mark and the injuries suffered by plaintiffs Chava Mark, Pdaya Mark, and TBM in the Terrorist Attack caused plaintiffs Chava Mark, Netanel Mark, Pdaya Mark, TBM, RLM, EBM, Yehoshua Mark, Shira Mark Harif, Miryam Mark, Orit Mark, David Shlomo Mark, severe harm, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

130.    The injuries suffered by plaintiff Chava Mark in the Terrorist Attack caused plaintiffs Ayelet Batt, Aryeh Batt, Avraham Batt, and Elisheva Hirshfeld, severe harm,

including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

131.    The murder of Rabbi Michael Mark and the harm and injuries suffered by the plaintiffs due to the Terrorist Attack were the direct and proximate result of Iran's conduct described herein.

132.    Iran is therefore liable for the full amount of plaintiffs' damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

133.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**WHEREFORE**, plaintiffs demand judgment as follows:

a. Judgment against defendant Iran for compensatory damages in an amount to be determined by the Court which is not less than $250,000,000 (two hundred fifty million dollars);

b. Judgment against defendant Iran for punitive damages in an amount to be determined by the Court;

c. Plaintiffs' costs and expenses;

d. Plaintiffs' attorneys' fees;

e. Such further relief as the Court finds just and equitable.


March 3, 2020

Plaintiffs, by their attorneys,


By: /s/   Paul G Gaston_____
Paul G. Gaston
DC Bar # 298033
LAW OFFICES PAUL G. GASTON
1901 Pennsylvania Avenue, NW,

Suite 607
Washington DC 20006
202-296-5856
paul@gastonlawoffice.com


 /s/ Asher Perlin_____
Asher Perlin
LAW OFFICE OF ASHER PERLIN
Bar I.D. FL0006
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
786-233-7164
asher@asherperlin.com