# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHAVA RACHEL MARK,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ISLAMIC REPUBLIC OF IRAN,** <br><br> Defendant. | Case No. 1:20-cv-00651 (TNM) |

## <u>MEMORANDUM OPINION</u>

This action for compensatory and punitive damages arises under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.  In July 2016, two Hamas terrorists opened fire on the Marks' family car as they drove near Hebron, Israel, towards Jerusalem.  Rabbi Michael Mark died instantly.  His wife, Chava, suffered grievous injuries, as did his daughter, Tehila, and son, Pdaya, both of whom sat in the back seat.  Fifteen members of the extended Mark family (collectively, Plaintiffs) now sue the Islamic Republic of Iran for the pain and suffering of the survivors and for the emotional trauma caused by the attack.  Plaintiffs allege that Iran provided material support to Hamas, who relied on it to commit the shooting.

Iran did not respond, and Plaintiffs now move for default judgment.  The Court finds that they successfully establish personal and subject matter jurisdiction under 28 U.S.C. § 1605A.  They have also proved Iran liable under federal law.  Plaintiffs are therefore entitled to default judgment and damages, though not always in the amounts they seek.  The Court thus will deny in part and grant in part their motion for default judgment.

## I. BACKGROUND

The terrorist attack at issue occurred in Israel in 2016.  *See* Compl. ¶ 2, ECF No. 1.

Plaintiffs allege that Hamas, an Islamic organization committed to the "eventual eradication of

the State of Israel," *id.* ¶ 30, perpetrated the attacks with "material support and resources" from

Iran, *id.* ¶ 4.

The Foreign Sovereign Immunities Act (FSIA) generally immunizes foreign sovereigns

from suits in federal courts, but "that grant of immunity is subject to a number of exceptions."

*Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  Once an exception

applies, the foreign state loses immunity.  *See Bell Helicopter Textron, Inc. v. Islamic Repub. of

Iran*, 734 F.3d 1175, 1182–83 (D.C. Cir. 2013).  One such exception, known as the "terrorism

exception," waives sovereign immunity for countries providing material support to terrorist

organizations.  *See* 28 U.S.C. § 1605A.  Plaintiffs bring their case under this exception.  *See*

Compl. ¶¶ 117–133.

Because Iran did not respond, Plaintiffs move for default judgment.  *See* Plaintiffs' Mot.

for Default J. (Mot.), ECF No. 33-1.  Entry of default judgment is "not automatic."  *Mwani v.

Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Before the Court can enter default judgment,

Plaintiffs must establish subject matter jurisdiction and personal jurisdiction.  *See Jerez v. Repub.

of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a

court's jurisdiction is void.").  Section 1605A provides a mechanism for Plaintiffs to show both

types of jurisdiction over a non-responsive sovereign.

The Court's analysis thus focuses on whether Plaintiffs have properly pled all elements of

a claim under § 1605A.  To do so, Plaintiffs must identify the terrorist group responsible for the

attack and show that Iran gave support to that group.  Plaintiffs have submitted expert

declarations to make those showings.  *See* Decl. of Dr. Matthew Levitt (Levitt Decl.), ECF No. 23-2; Decl. of Arik Brabbing (Brabbing Decl.), ECF No. 27-1.

The Court assesses this evidence and makes findings of fact before proceeding to findings of law.  *See Selig v. Islamic Repub. of Iran*, 573 F. Supp. 3d 40, 51–52 (D.D.C. 2021) (accepting expert declarations as sufficient to meet plaintiffs' evidentiary burden).

## II.  FINDINGS OF FACT

### A.  Hamas

Members of the Muslim Brotherhood founded Hamas in 1987.  *See* Brabbing Decl. at 4.[1] Hamas intends to replace Israel with "a religious, Islamic, Palestinian state."  *Id.*  To do so, Hamas sees "no solution . . . except through Jihad."  Levitt Decl. at 6.  Hamas has pursued its mission through "countless acts" of terrorism against Israeli citizens.  *Id.* at 12.  Those acts include kidnappings, rocket attacks, and other bombings.  *See id.*

Hamas intertwines its military and terror activities with social services.  *See id.* at 8. According to Plaintiffs' expert, Hamas establishes charities and other ostensibly benevolent programs "to enhance its image and earn goodwill in the Palestinian community."  *Id.* at 11 (cleaned up).  These charities distribute aid to Palestinians, who as a result "feel that they owe a duty of loyalty" to Hamas.  Brabbing Decl. at 7.  More, Hamas uses these programs to identify, groom, and recruit young Palestinians for terrorist operations.  *See id.*; Levitt Decl. at 12.

### B.  Iranian Support for Hamas

Plaintiffs rely on Dr. Matthew Levitt for evidence of Iran's support for Hamas.  He is a Senior Fellow at the Washington Institute, a former Treasury Department official, and an expert

---

[1]  All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

in international terrorism.  *See* Levitt Decl. at 1–3.  According to Levitt, Iran has supported

Hamas for many years.  His testimony echoes statements from the U.S. State Department that

"Iran gives Hamas funds, weapons, and training."  Levitt Decl. at 26.  Levitt focuses on those

three methods of support.

*First*, funding.  Although no expert pinpoints the exact amount of funding sent by Iran,

all agree that "the sum is significant," to the tune of tens of millions of dollars per year.  *Id.* at 21.

Indeed, the State Department has estimated that Iranian support for Hamas once reached $300

million per year, *see id.* at 26, usually through a network of Iranian banks and other

intermediaries, *see id.* at 29–31.  Iranian donations sometimes are more direct.  Levitt recounts

that Iran delivered suitcases of cash directly to Hamas militants in the Gaza Strip.  *See* Levitt

Decl. at 28.  No wonder then that a Hamas leader in 2016 hailed "the financial and military

support Iran provides to [Hamas's] military wing[.]"  *Id.* at 21.  And beyond the military funding,

Iran has also transferred money directly to Hamas's charitable organizations.  *See* Brabbing

Decl. at 7.  Levitt testifies that Iran is committed to using these organizations "in the battle for

public opinion."  Levitt Decl. at 22 (cleaned up).  In short, Iran has consistently supported Hamas

financially.

*Second*, weapons.  Levitt details how Iran has provided arms to Hamas.  Iranian officials

have admitted as much, with one acknowledging that "[m]uch of the arms Hamas deployed" in

2014 "were the products of [ ] Iran."  *Id.* at 26.  Another politician described missiles used by

Hamas as "the blessings of Iran's transfer of technology[.]"  *Id.* at 25.  Israel has repeatedly

intercepted these Iranian "blessings."  In 2003, the Israeli navy captured a ship with $2 million of

armaments bound for Palestine.  *See id.* at 24.  And in 2014, the navy intercepted another ship

loaded with rockets, shells, and ammunition.  *See id.* at 26–27.  That shipment originated in Iran.

*See id.* at 27.  More, the State Department concluded in 2015 that Iran provided Hamas with

"missile technology" and helped Hamas rebuild a network of tunnels under the Gaza-Israel

border.  *Id.* at 26.  Indeed, one Hamas leader in 2014 thanked Iran for "missiles" and "anti-tank

missiles" that Hamas used against Israelis.  *Id.* at 37.

*Third*, training of Hamas soldiers by the Iranian Revolutionary Guards.  *See id.* at 24.  As

early as 1996, a Hamas bomber admitted that he received months of training in Iran.  *See id.* at

23.  In 2008, another Hamas commander said the training received in Iran increased Hamas's

"capacity to fight."  *Id.*  That training includes courses on "infantry, guerrilla warfare, sabotage[,]

and anti-tank operations."  *Id.* at 24 (cleaned up).  And this training helps Hamas to in turn teach

its own people.  Iran wants to "train the trainer" so that Hamas operatives who attend these

sessions can pass on their knowledge to others in the Gaza Strip.  *Id.* at 23.

Based on this information, Levitt concludes that, as of the attack, Iran had provided

"many millions of dollars" to Hamas.  *Id.* at 37.  Critically, Iran's support makes individual

terrorist attacks easier and funds Hamas's network of charitable organizations.  *See id.* at 32.

Without Iran's support, Levitt says, "Hamas could never have become the capable and deadly

terrorist organization it is today."  *Id.* at 38.  Indeed, Hamas's military leader specially thanked

Iran in 2014, noting the importance of Iran's "funds, weapons and other [forms of aid]" in

Hamas's battles against "the occupier" Israel.  *Id.* at 37.  After assessing Levitt's evidence, the

Court agrees.  Iran provided money, weapons, and training to Hamas before and during the

period when the attack took place.

### C.  The Attack

On July 1, 2016, Muhammad al-Faqiya and Muhammad Abd al-Majid Muhammad

Amayra drove a car containing automatic rifles around residential neighborhoods near Hebron, a

city in the West Bank. *See* Brabbing Decl. at 27. Their car had fake Israeli plates. *See id.* at 28. Jewish civilians frequented these roads, and the two men had traversed them for days trying to find "a Jewish civilian vehicle." *Id.* at 27. They had yet to find one but "bided their time." *Id.* On that day, Faqiya at first drove and Amayra sat in the passenger seat, but the two switched places shortly into their ride. *See id.* at 28. Sometime in the afternoon, they noticed a vehicle carrying a Jewish family. *See id.*

Inside that car was Rabbi Michael Mark, his wife Chava Mark, their 15-year-old son Pdaya Mark, and their 14-year-old daughter Tehila Mark. *See* Compl. ¶ 63. They were en route to share the Sabbath with Michael's mother in Jerusalem. *See id.* Faqiya directed Amayra to overtake the Marks' car. *See* Brabbing Decl. at 28. As the two men pulled alongside, Faqiya extended a Kalashnikov rifle through his passenger window and fired about 25 bullets into the Marks' car. *See id.* Five bullets struck Michael, killing him instantly.[2] *See* Compl. ¶ 65. One also struck Tehila in her stomach. *See* Friedman Report on Tehila at 1, ECF No. 30-6. Michael lost control of the car, and it flipped over. *See* Compl. ¶ 67. The car eventually skidded to a halt with the Marks still inside. Chava was unconscious, and shrapnel had lodged in Pdaya's legs. *See* Dep. of Pdaya Mark at 11, 15, ECF No. 25-9 (Pdaya Dep.).

Amayra turned his car around and drove back towards the Marks' overturned vehicle. *See* Brabbing Decl. at 28. Faqiya exited and fired another shot. *See id.* That bullet passed through Chava's right eye and right temple before exiting through the top of her head. *See* Dep.

---

[2] Because this case involves multiple persons with shared family names, the Court will introduce individuals by first and last name and afterward refer to them by first name only.

of Aryeh Batt at 9, ECF No. 25-1.  Amayra noticed other cars approaching and called Faqiya

back into the car.  *See* Brabbing Decl. at 28.  The two men sped off.

First responders rushed Chava and Tehila to the hospital.  Chava had a broken orbital

bone and bone fragments in her brain.  *See* Friedman Report on Chava at 1, ECF No. 30-3.

Doctors performed an emergency bifrontal craniotomy to relieve the tension on her brain.  *See*

*id.*  Chava miraculously survived the procedure, though she would have multiple surgeries in the

coming months and years and would never fully recover.  As for Tehila, doctors removed the

bullet in her abdomen without incident and discharged her a few days later.  *See* Friedman

Report on Tehila at 1.

Israeli law enforcement found Amayra shortly later, and he admitted his role in the

attack.  *See* Brabbing Decl. at 30.  Faqiya took longer to find.  He originally hid in a student

dormitory operated by al-Kulta al-Islamiya, Hamas's student wing, *see id.* at 11, 29, but Israeli

police discovered him one month later in a village southwest of Hebron, *see id.* at 30.  After a

stand-off, police shot and killed him.  *See id.*  Next to his corpse they found a Kalashnikov rifle

later identified as the gun used to attack the Marks.  *See id.*

That same day, Hamas posted a press release on its website praising Faqiya for the Mark

attack.  *See id.*  Hamas's leader in the Gaza Strip also proclaimed Faqiya as a Hamas *shahid*,

meaning a martyr.  *See id.*  Many months later, Hamas would again praise Faqiya as a martyr

who died in 2016 "while engaging in terrorist activities."  *Id.* at 31.  Given this evidence, the

Court finds that Michael, Chava, Pdaya, and Tehila suffered their injuries at Hamas's hands.

Chava, Pdaya, and Tehila sue for their physical and emotional injuries.  The remaining

members of the Mark family, including Michael's children and Chava's mother and siblings, sue

for emotional injuries alone.  All Plaintiffs are U.S. citizens.

### III. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter default judgment when a party applies for it.  But entry of default judgment "is not automatic."  *Mwani*, 417 F.3d at 6.  A court must assure itself of its subject matter jurisdiction, *see Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996), and of its personal jurisdiction over an absent defendant, *see Mwani*, 417 F.3d at 6–7.

Extra procedures govern entry of default when the defendant is a sovereign state.  The FSIA "affords the sole basis for obtaining jurisdiction over a foreign state in United States courts."  *Mohammadi*, 782 F.3d at 13.  The FSIA generally immunizes foreign states, but that grant of immunity "is subject to a number of exceptions."  *Id.* at 14.  Relevant here is the so-called terrorism exception found in 28 U.S.C. § 1605A.  Section 1605A confers subject matter jurisdiction, recognizes a federal cause of action against foreign states subject to the exception, and addresses personal jurisdiction by specifying procedures that a plaintiff must follow to effect service on a foreign state.  *See Schwartz v. Islamic Repub. of Iran*, No. 18-cv-1349 (RDM), 2020 WL 7042842, at *9 (D.D.C. Nov. 30, 2020).

Different standards of proof govern federal courts' personal jurisdiction and subject matter jurisdiction inquiries.  Plaintiffs need only make a "prima facie showing" of personal jurisdiction.  *Mwani*, 417 F.3d at 6–7.  But for a court to exercise subject matter jurisdiction, plaintiffs must "establish[] [their] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The statute does not specify what constitutes "evidence satisfactory to the court," so courts determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Dem. People's Repub. of Korea*, 774 F.3d 1044, 1046–51 (D.C. Cir. 2014).  The evidence must consist of "admissible testimony in accordance with the Federal Rules of

Evidence," *id.* at 1049 (cleaned up), and it must be sufficient for a court to come to the "logical conclusion" that the defendant is responsible for the plaintiffs' injuries, *id.* at 1051.

## IV.  ANALYSIS

The Court's analysis proceeds as follows.  First, the Court will determine whether it has subject matter jurisdiction.  Then the Court considers whether it has personal jurisdiction over Iran.  Next, the Court evaluates whether Plaintiffs have pled a federal cause of action and whether they have proven a theory or theories of liability.  Finally, the Court assesses Plaintiffs' claims for monetary damages.

### A.  Subject Matter Jurisdiction

To invoke the terrorism exception, Plaintiffs must make two threshold showings.  *First*, the claimant or victim must be a U.S. national, a U.S. servicemember, or a U.S. government employee.  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii).  Plaintiffs easily meet the requirement because the victims of the attack, Chava, Pdaya, and Tehila, are U.S. citizens, as are the other Plaintiffs. *See* Compl. ¶¶ 8, 12–21, 24–27.

*Second*, the State Department must have designated the foreign government as a state sponsor of terrorism at the time of the attack and when Plaintiffs filed their lawsuit.  *See* 28 U.S.C. § 1605A(a)(2)(A)(i).  Plaintiffs again easily clear this hurdle:  The State Department has designated Iran a state sponsor of terrorism since 1984.  *See* Dep't of State, Bureau of Counterterrorism, *State Sponsors of Terrorism* (last accessed Sept. 2, 2022), https://www.state.gov/state-sponsors-of-terrorism.

Once past those thresholds, Plaintiffs must show that their claims fit within the terrorism exception's narrow waiver of sovereign immunity.  The waiver contains five requirements:

[1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage

taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The Complaint self-evidently establishes the first two requirements. Plaintiffs seek money damages, *see* Compl. ¶ 133(a)-(b), for their suffering after the attack, *see id.* ¶¶ 125–30.  The Court's analysis thus focuses on the latter three requirements, though in a different sequence.

   *Iran provided Hamas with "material support" to carry out the attack.*  Recall the resources that Hamas received from Iran.  *See supra* II.B.  Iran provided money for Hamas's military and social operations, delivered weapons, and trained Hamas's fighters.  And Iranian politicians touted their support for Hamas around the time of the attack.  *See* Levitt Decl. at 25– 26.  Those officials included Qassem Soleimani, the now-deceased head of the Islamic Revolutionary Guard, who in a 2014 letter noted Iran's support and referred to Hamas' leaders as "my dear brothers."  *Id.* at 28.  Plaintiffs have thus provided evidence "satisfactory to the court," 28 U.S.C. § 1608(e), that Iran materially supported Hamas and that this support came from the country's officials and agents "while acting within the scope of [their] office, employment, or agency," *id.* § 1605A(a)(1).

   *The attack was an "extrajudicial killing."*  The definition of "extrajudicial killing" comes from the Torture Victim Protection Act of 1991, which defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  *See* 28 U.S.C. § 1350 note.

   The attack on the Marks fits the bill.  Hamas operatives murdered Michael and "in no way acted as a regularly constituted court" or had any "authority" for the killing.  *Valore v.*

10

*Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010).  And the shooters "deliberated" a killing because the evidence shows they undertook the attack "with studied consideration and purpose."  *Selig*, 573 F. Supp. 3d at 60 (cleaned up).  Days before, Faqiya told his brother and another friend that he planned to commit an attack.  *See* Brabbing Decl. at 20–21.  He swapped clandestine messages with Hamas operatives confirming as much, *see id.* at 24, and procured a Kalashnikov rifle, *see id.* at 25.  More, he acquired a car specifically to cloak his identity during the attack, *see id.* at 22, and kept the rifle in the car on the "number of occasions" when he and Amayra searched for Jewish victims, *id.* at 27.  Finally, Amayra admitted later that he turned their car around after the shooting to "confirm that the victims were all dead."  *Id.* at 28.  The two men planned to kill that day, and only the presence of other cars saved the Marks from even greater suffering.  *See id.* at 28 ("On the return drive to Dura, Faqiya told Amayra that he saw minor children in the car and that he regretted that he had not had sufficient time to kill them.").

    That Faqiya killed Michael obviously justifies awards related to his death, but it also justifies awards related to the injuries of the other victims.  The terrorism exception applies to "personal injury or death that was caused by an *act* . . . of extrajudicial killing."  28 U.S.C. § 1605A(a)(1) (emphasis added).  "[T[he same *act* of killing one person can quite obviously injure another[.]"  *Force v. Islamic Repub. of Iran*, — F. Supp. 3d —, 2022 WL 2452606, at *5 n.1 (D.D.C. July 5, 2022) (emphasis in original).  Thus, although Chava, Tehila, and Pdaya survived, the same act that extrajudicially killed Michael also caused their injuries.  *Accord Schwartz*, 2020 WL 7042842, at *12 (collecting cases and noting that "several decisions from this district have held that individuals who are injured but not killed in an attack that results in the death of others may recover for their injuries under § 1605A" (cleaned up)).  And the same act that injured the trio also caused emotional trauma in other Plaintiffs over those injuries.  The

terrorism exception therefore authorizes compensation for Chava's, Tehila's, and Pdaya's physical injuries and related emotional injuries of those close to them.

*Iran's support to Hamas caused Plaintiffs' injuries.*  The FSIA requires Plaintiffs to show proximate cause, meaning "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Borochov v. Islamic Repub. of Iran*, — F. Supp. 3d —, 2022 WL 656168, at *9 (D.D.C. Mar. 4, 2022) (cleaned up).  To establish a "reasonable connection," Plaintiffs must show both that "the defendant's actions were a substantial factor in the sequence of events that led to their injury" and that their injury "must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* (cleaned up).

Levitt concludes that Iranian support "is critical both to run an organization like Hamas and to finance individual attacks."  Levitt Decl. at 35.  Monetary donations help Hamas bear the costs for its terrorist attacks and its social welfare projects.  *See id.* at 32.  And the influx of Iranian weapons helps Hamas "to maintain order and control" in Palestine and increases its "ability to fire mortars and rockets into Israel." *Id.* at 37 (cleaned up).  The U.S. Department of Defense agrees, noting that Iran's support for Hamas "produced improvements in the group['s] capabilities and increased the threat to Israeli and U.S. interests in the region." *Id.* at 36.  More, Hamas itself agrees.  One military spokesman regards Iran "first and foremost" among the organization's supporters. *Id.* at 37.  Another Hamas chief likewise said "Iranian backing is in the lead" of all nations that support Hamas. *Id.* at 36.  This evidence persuades the Court that Iranian support was key to the attack on the Marks.

The Court also finds that the attack caused reasonably foreseeable suffering.  Hamas has a long history of planning and conducting attacks in Israel.  Iran has consistently supported

Hamas throughout, including through training Hamas operatives since the early 2000s.  *See id.* at 23.  During that time, Levitt reveals, Iran has also directed its proxies to engage in terrorist attacks.  *See id.* at 35.  Add in the multiple weapons shipments, transfers of millions of dollars, and statements from Hamas officials thanking Iran by name, and the evidence establishes that Iran supported Hamas with full knowledge of its terroristic operations.  The suffering of the Mark family was thus reasonably foreseeable.

For these reasons, the Court finds that the terrorism exception applies and that Iran has no sovereign immunity.  This case falls therefore within the Court's subject matter jurisdiction.  *See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

## B.  Personal Jurisdiction

A court has personal jurisdiction over a foreign state when it has subject matter jurisdiction and the plaintiff has made service as required by 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."  28 U.S.C. § 1608(a)(1).  The second is "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2). Next, a plaintiff can effect service "by sending a copy of the summons and complaint and a notice of suit . . . by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state

concerned." *Id.* § 1608(a)(3).  And finally, if none of the first three methods works, a plaintiff

can serve the documents through the Department of State.  *Id.* § 1608(a)(4).

Here, no special arrangement governs service of process to Iran, nor has Iran joined an

international convention on the service of judicial documents.  *See Selig*, 573 F. Supp. 3d at 62.

Plaintiffs next attempted an international mailing by the Clerk of Court, but the Clerk was unable

to effect service.  *See* Min. Entry, May 28, 2020.  So Plaintiffs requested the State Department to

complete service under § 1608(a)(4).  *See* Response to Court Order at 2–3, ECF No. 16.  This

last route succeeded.  According to a letter from the Department, it served Iran by diplomatic

note.  *See* ECF No. 18.

Because the Court has subject matter jurisdiction and Plaintiffs made proper service, the

Court has personal jurisdiction over Iran.

## C.  Causes of Action

The FSIA creates a private cause of action against foreign state sponsors of terrorism

liable for "personal injury or death."  *See* 28 U.S.C. § 1605A(c).  The elements of this cause of

action overlap with the terrorism exception to sovereign immunity, so the Court's subject matter

jurisdiction analysis shows that the exception's cause of action is available here.  *Accord Foley v.

Syrian Arab Repub.*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).  And all Plaintiffs are either U.S.

nationals or the legal representative of a U.S. national, so they all may use that cause of action.[3]

*See* 28 U.S.C. § 1605A(c)(1)-(3).

---

[3]  David Shlomo Mark, nicknamed Shlomi, was alive at the time of the attack but died in 2019.
*See* Mot. at 59.  His estate is a Plaintiff here, represented by his wife Yisca, who is an Israeli
citizen.  *See* Mot. at 2, n.5.  Her citizenship does not matter.  "An estate of a plaintiff who would
have had standing to sue is expressly covered by, and entitled to bring claims under, [§]
1605A(c)."  *Doe v. Dem. People's Repub. of Korea*, 414 F. Supp. 3d 109, 125 (D.D.C. 2019)
(cleaned up).  Shlomi was a U.S. citizen, *see* Compl. ¶ 21, so his estate can bring claims now for
damages resulting from the attack.

That said, although the FSIA provides a private cause of action, it does not provide the substantive basis for Plaintiffs' claims. *See Selig*, 573 F. Supp. 3d at 62. Plaintiffs must instead "prove a theory of liability" to justify holding Iran liable. *Roth v. Islamic Repub. of Iran*, 78 F. Supp. 3d 379, 399 (D.D.C. 2015). When adjudicating those theories, the Court cannot "fashion a complete body of law." *Bettis v. Islamic Repub. of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). Instead, the Court relies "on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises." *Fraenkel v. Islamic Repub. of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018).

### 1. Battery

As survivors of the attack, Chava, Tehila, and Pdaya allege that Iran committed battery. Iran is liable for battery if it (1) acted "intending to cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact" by those attacked and (2) "a harmful contact" with those attacked "directly or indirectly result[ed]." Restatement (Second) of Torts § 13; *see Roth*, 78 F. Supp. 3d at 400. Harmful contact occurs when "any physical impairment" or "physical pain or illness" results from an incident. Restatement (Second) of Torts § 15.

Iran supported Hamas with the intent to cause harmful contact. "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear." *Valore*, 700 F. Supp. 2d at 77. And the three survivors suffered physical harm. Chava suffered a grievous gunshot wound to her head, *see* Friedman Report on Chava at 1, ECF No. 30-3, causing her horrific pain and months of recovery. Tehila sustained a gunshot wound to her stomach that also required surgery. *See* Friedman Report on Tehila at 1. Finally, although Pdaya experienced less serious injuries, the shooting caused shrapnel wounds in his legs. *See* Friedman Report on Pdaya at 1, ECF No. 30-5. All three thus endured "a harmful contact" because of the shooting. Restatement

(Second) of Torts § 13.  They have therefore shown Iran's liability under the FSIA for battery and for the physical injuries resulting from that battery.[4]

### 2.  Solatium/Intentional Infliction of Emotional Distress

All Plaintiffs sue for "loss of solatium," *see* Compl. ¶¶ 125–30, which is "the mental anguish, bereavement, and grief" experienced by those with a close relationship to the victim. *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018) (cleaned up). Under the FSIA, a solatium claim "is indistinguishable" from an intentional infliction of emotional distress (IIED) claim.  *Id.*  Courts apply the Restatement (Second) of Torts to these claims.  *See, e.g.*, *Abedini v. Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019).

Iran is liable for IIED if it "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another."  Restatement (Second) of Torts § 46(1).  The Restatement permits recovery by (1) members of the victim's immediate family (2) who were present at the time of the conduct.  *See id.* § 46(2); *Est. of Hirshfeld*, 330 F. Supp. 3d at 141.

Iran provided material support to Hamas with the understanding and intent that Hamas would carry out attacks in Israel.  Those acts of terrorism "are inherently extreme and outrageous."  *Abedini*, 422 F. Supp. 3d at 135.  And because of the outrageousness of an act of terrorism, courts have waived the Restatement's presence requirement for family members so long as they "suffer[ ] mental anguish and trauma as a result of" the attack.  *Cohen v. Islamic Repub. of* Iran, 238 F. Supp. 3d 71, 85 (D.D.C. 2017); *see also Est. of Hirshfeld*, 330 F. Supp. 3d

---

[4]  Because Iran is liable for battery against Tehila and Pdaya, the Court need not analyze their argument, *see* Mot. at 31, that Iran also committed assault.  *See Braun v. Islamic Repub. of Iran*, 228 F. Supp. 3d 64, 80 (D.D.C. 2017) ("[R]ecovery for the same injury under more than one theory of liability is forbidden.") (citing *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976)).

at 141.  "Thus, all family members can recover for IIED regardless of their presence at the attack." *Borochov*, 2022 WL 656168, at *11.

The Court has reviewed each Plaintiff's deposition transcripts and their medical reports. The Court is persuaded that all of them suffered "severe emotional distress" from Michael's death and from the injuries suffered by Chava, Tehila, and Pdaya.  Restatement (Second) of Torts § 46(2).  Plaintiffs have thus established Iran's liability under the federal private right of action for their solatium claims.

### D.  Individual Damages

The Court moves next to damages.  To obtain damages in a FSIA suit, "a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and he must prove the amount of damages by a reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136 (cleaned up).  Recall that physical injuries and emotional suffering were a foreseeable result of Iran's actions. *See supra* IV.A.  So the Court must determine whether each Plaintiff's claim for damages is supported by a "reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136.

Assessing damages "is an imperfect science." *Goldstein v. Islamic Repub. of Iran*, 383 F. Supp. 3d 15, 19 (D.D.C. 2019).  No amount of money can compensate a victim and his family for suffering after a terrorist attack.  "In the interest of fairness, however, courts strive to maintain consistency of awards" between plaintiffs in comparable situations. *Id.*  To achieve consistency, courts in this district have adopted standard amounts for each type of plaintiff. Those figures originate from *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). *Heiser* is a useful reference point, "not binding precedent." *Fraenkel*, 892 F.3d at 351.  Courts depart from these standards depending on the facts of each case. *See Selig*, 573 F. Supp. 3d at 64 (collecting cases); *see also Fraenkel*, 892 F.3d at 361 ("District Court judges

invariably must exercise discretion in determining damages awards under the FSIA.").  Thus, the Court will treat them as a guide only.

The relevant standards for damages are as follows.  For pain and suffering, courts generally assume that "persons suffering substantial injuries in terrorist attacks" should receive $5 million in damages.  *Barry v. Islamic Repub. of Iran*, 410 F. Supp. 3d 161, 180 (D.D.C. 2019); *see Cohen*, 268 F. Supp. 3d at 24.  Substantial injuries include "compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as lasting and severe psychological pain." *Valore*, 700 F. Supp. 2d at 84 (cleaned up).  That standard varies, however, depending on the extent of the injuries.  For "more severe instances of physical or psychological pain," like where victims "were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," courts adjust the standard amount to $7.5–$12 million in damages.  *Id.*  On the other end of the scale, victims who suffer "severe emotional injury accompanied by relatively minor physical injuries" typically receive $1.5–$3 million.  *Barry*, 410 F. Supp. 3d at 180 (cleaned up).  Awarding damages for physical injuries "assumes severe psychological injuries." *Id.* (cleaned up).

For solatium damages, the standard amount "depends in part on the nature of the relationship between the family member and the victim, and the severity of the pain suffered by the family member." *Bathiard v. Islamic Repub. of Iran*, Nos. 16-cv-1549, 17-cv-2006, 2020 WL 1975672 at *5 (D.D.C. Apr. 24, 2020) (cleaned up).  For a deceased victim like Michael, spouses typically receive $8 million, children receive $5 million, and siblings receive $2.5 million.  *See Selig*, 573 F. Supp. 3d at 65.  And when a victim suffers a nonfatal injury, like Chava, Tehila, and Pdaya, courts have applied a framework under which "[s]pouses receive $4 million, parents receive $2.5 million, and siblings receive $1.25 million." *Moradi v. Islamic*

*Repub. of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015). "Children of a surviving victim receive

$1.5 million on average." *Spencer v. Repub. of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014).

Recall, however, that these figures "are not set in stone and the Court may award greater

amounts in cases with aggravating circumstances" or lower amounts "where the relationship

between the claimant and the decedent is more attenuated." *Selig*, 573 F. Supp. 3d at 65 (cleaned

up).

Now to apply this framework to Plaintiffs.

*Chava Mark.*  Chava seeks $20 million in pain and suffering.  *See* Mot. at 44.  The

shooting gave Chava a "brain contusion with an open wound," a "penetrating injury of the right

eye," and "massive" injuries to her orbital bones.  Friedman Report on Chava at 1.  Bone

fragments came to rest in the front lobe of her brain, and doctors performed an emergency

craniotomy to remove them.  *See id.*  That operation also required the removal of her right eye.

*See id.*  Chava began recovery but developed more brain issues, which required more surgeries.

*See id.* at 1–2.  As of November 2021, she has undergone five surgeries since the initial

emergency operation, all to repair her facial bones and to excise various infections.  *See id.* at 2.

As a result, she often loses her balance, cannot sleep, and "has no short-term or intermediate-

term memory."  *Id.* at 3.  Her personality has changed.[5]  *Id.* at 4.  She has also lost her sense of

smell.  *See id.*  More, Chava cannot live alone because of her injuries and cognitive impairments.

*See id.* at 10.  In short, the shooting left Chava "disfigured," depressed, and reliant on others for

care.  Strous Report on Chava at 3, ECF No. 30-12.  A physician hired to examine her expects no

"significant improvement" in her symptoms.  *See* Friedman Report on Chava at 11.

---

[5]  These effects are no surprise given Chava's injuries.  One psychiatrist likened them to the aftermath of a frontal lobotomy, the discredited procedure that caused debilitating personality defects in patients during the mid-1900s.  *See id.* at 9.

Chava's injuries are indeed grievous and severe, warranting an upward adjustment from the standard $5 million under *Heiser*. Consistent with recent awards for similar injuries, the Court will award her $9 million for her pain and suffering. *See Cabrera v. Islamic Repub. of Iran*, Nos. 19-cv-3835, 18-cv-2065, 2022 WL 2817730, at *30, *45 (D.D.C. July 19, 2022) (awarding $9 million to servicemember who lost a "big chunk of his skull" after shrapnel from IED sliced through his head and optic nerve); *Barry*, 410 F. Supp. 3d at 182 (awarding $9 million to man who was "left without any bone structure" on the right side of his face after a bombing). An award of $9 million appropriately compensates Chava for her severe injuries and tracks those other awards. *Accord Borochov*, at *15 ("In the interest of fairness, however, courts strive to maintain consistency of awards between plaintiffs in comparable situations." (cleaned up)).

The Court acknowledges that Chava requests more, but her support for a $20 million award is lacking. For that figure, she relies on two old cases, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006), and *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003). To be sure, those cases bear similarities to this one. The plaintiffs there suffered brain injuries like Chava's, *see Campuzano*, 281 F. Supp. 3d at 263; *Blais*, 459 F. Supp. 2d at 49, and one underwent a craniotomy like Chava did, *see Campuzano*, 281 F. Supp. 2d at 263.

But those awards are anomalies. An award of $20 million falls well outside the heartland of what courts today typically award for pain and suffering. Substantial injuries under the prevailing *Heiser* figures merit up to $12 million in damages, not $20 million. More, courts largely have rejected *Blais* and *Campuzano* in the decades since their decision, largely because they predate the now-accepted *Heiser* framework. *See, e.g.*, *Cabrera*, 2022 WL 2817730, at *45

(declining to follow *Campuzano*).  The Court likewise will not follow such dated and atypical precedents.

Chava also requests solatium.  *See* Mot. at 45.  Chava and Michael had 10 children together over 28 years of marriage.  *See* Strous Report on Chava at 4.  During the first months after the attack, Chava was in a state of denial about Michael's death.  *See id.*  She continued to send him messages and speak about him in the present tense until November 2020, when she finally acknowledged he had passed.  *See id.*  She suffered depression from his absence and maintained that "she lost the foundation of her life."  *See id.* at 5.  According to her, Michael was "the glue of the family."  *Id.*

Chava has also experienced emotional difficulties from the injuries to Pdaya and Tehila. It frustrates her that she cannot help them more with their own medical, psychological, and emotional issues.  *See* Dep. of Chava Mark at 13, ECF No. 25-5 (Chava Dep.).  Chava's own issues make it difficult for her to engage on the emotional side of their suffering.  *See id.*

For these emotional injuries, Chava requests $12 million for Michael's death and $4 million each for the injuries to Pdaya and Tehila.  The Court will not go that far.  As for Michael, Chava describes the usual anguish accompanying the violent death of a spouse.  The *Heiser* standard of $8 million accounts for that pain.  And although she likens herself to the spouse of a long-term hostage, *see* Mot. at 45, Chava's confusion at her husband's death appears to stem from her own injuries.  Her emotional distress thus differs in kind from that of a distant wife who learns that her husband has disappeared in a foreign land.  *See, e.g.*, *Stansell v. Repub. of Cuba*, 217 F. Supp. 3d 320, 347 (D.D.C. 2016) (awarding $12 million to wife of hostage victim because she had no initial information surrounding his death).  At bottom, Chava's understandable

anguish at Michael's death is not so unusual to warrant an upward departure. The Court will award her the still-substantial sum of $8 million.

Ditto for solatium over the injuries to Pdaya and Tehila. Many parents cannot help their injured children with "medical, psychological, and emotional issues" after a terrorist attack. Mot. at 45. These attacks are indeed traumatic, yet the *Heiser* standards account for the emotional distress of a parent who sees her children injured. *Accord Borochov*, 2022 WL 656168, at *16 ("These harms are consistent with those suffered by many parents of victims of terrorism." (cleaned up)). The Court thus will award Chava $2.5 million each for her distress at Pdaya's and Tehila's injuries.

All told, the Court will award Chava $9 million in pain and suffering, $8 million in solatium for Michael's death, and $2.5 million each in solatium for the injuries to Pdaya and Tehila.

The Court acknowledges that she seeks more and that she has clearly suffered greatly. Courts awarding FSIA damages must view the situation holistically, both as to the plaintiff's total injuries and across cases. For example, one person who loses three family members to a terrorist attack does not necessarily suffer three times more than someone who loses one family member. And judges in this district strive to ensure that their awards correspond to the events at issue and to similar cases before other judges. The Court has done so for Chava. By awarding her less than she requests, the Court intends no minimization of her dreadful suffering. *Accord Selig*, 573 F. Supp. 3d at 75 ("[M]ost—if not all—people eligible for *Heiser*-type compensation have endured the unimaginable[.]"). But her award of $22 million in damages is still large and, critically, tailored to the evidence that she presents.

*Tehila Mark*.  Tehila requests $5 million in pain and suffering.  *See* Mot. at 47.  At the time, she was 14 years old.  *See* Friedman Report on Tehila at 1.  A bullet entered her lower abdomen on her left side.  *See id.*  Once the car flipped over and stopped, Tehila saw that Pdaya was unhurt but also saw her parents in the front seats, upside down with their seatbelts on.  Dep. of Tehila Mark at 9, ECF No. 25-11 (Tehila Dep.).  Tehila assumed they were dead.  *See id.*  She saw Faqiya walk back to the overturned car, and she thought he would shoot her and Pdaya as well.  *See id.* at 11.  Once he fled, a passerby helped her out of the car and gave her a towel to stop her bleeding.  *See id.* at 12.  First responders took her to the hospital, where she underwent emergency surgery to remove the bullet.  *See id.*  That surgery succeeded.  During all of this, Tehila assumed her parents had died.  *See* Strous Report on Tehila at 2, ECF No. 30-22.

Only later did she learn that her father was dead and that her mother clung to life.  *See id.*  The hospital discharged Tehila a few days later, and she immediately observed Jewish mourning rites.  *See* Friedman Report on Tehila at 1.  She could not walk for a couple of weeks after the surgery.  *See id.*  For the first year afterwards, her anxiety kept her from normal sleep.  *See* Strous Report on Tehila at 3.  She became constantly on edge and experienced troubling flashbacks in which she imagined someone shooting at her.  *See id.* at 3–4.

Because Tehila suffered a gunshot wound requiring emergency surgery, her injuries are substantial under the *Heiser* framework.  For those injuries, the Court will award her the requested $5 million in pain and suffering.

Tehila also seeks $6.25 million in solatium for Michael's death and for Chava's injuries, as well as $1.25 million for Pdaya's injuries.  *See* Proposed Order at 1, ECF No. 37-2.  The attack hit Tehila hard.  Before it, she and her mother were "extremely close," but her mother's

injuries have changed that dynamic.  Strous Report on Tehila at 4.  Tehila describes their relationship now as "no longer a relationship of a mother and daughter."  Tehila Dep. at 25.

Tehila also felt the loss of her father "in everything."  *Id.* at 20.  Because he was "such a dominant and strong character" in her life, his death completely changed her outlook.  Strous Report on Tehila at 4.  As for Pdaya, she worries about him, *see* Tehila Dep. at 21, though her relationship with the entire family has "disintegrated" because of the attack, *see id.* at 25.

Beyond these issues, Tehila reacted in a self-destructive way to the attack.  One year later, she attempted suicide through an overdose of sleeping pills.  *See* Strous Report on Tehila at 5.  She failed, but she later grew addicted to alcohol as a coping mechanism for her pain.  *See id.* at 8.  Tehila eventually overcame that addiction, but her "distress, anxiety, and depression" remain.  *See id.* at 11.  Her psychologist expects these issues to "continue to affect her indefinitely."  *Id.*

For her distress at Pdaya's injuries, Tehila will receive the *Heiser* standard of $1.25 million.  The Court will enhance, however, the awards for her trauma at Michael's death and Chava's injuries.  "[C]ourts have recognized the particularly devastating effect that the loss of a parent can have on minors[.]"  *Selig*, 573 F. Supp. 3d at 75.  Because Tehila was 14, she lost an irreplaceable provider, guide, and nurturer at a critical point in her young life when Michael died.  *See id.* at 72.  Consistent with this Court's award to minor plaintiffs in *Selig*, it will award her $6.25 million in solatium for Michael's death.

As for Chava's injuries, the Court will not grant the full extent of Tehila's requested enhancement.  Chava is injured, not gone.  Tehila (and indeed all the Mark children) is thus mistaken to liken her solatium to awards for a parent's *death*.  *See* Mot. at 48–50 (citing *Belkin*, 667 F. Supp. 2d at 23–24 (enhanced award to husband of dead victim), *Flanagan v. Islamic*

*Repub. of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (enhancements for "Kevin's death"), *Baker*, 775 F. Supp. 2d at 83 (enhancement for "sister's death")).  The Court cannot equate the diminished relationship between a child and her impaired parent with the severed relationship between a child and his deceased parent.

That said, the Court will enhance Tehila's solatium award for Chava's injuries to $2.5 million.  She attests to "severe emotional difficulties" resulting from Chava's injuries and to "significant changes in the family dynamic," including that she no longer has a mother-daughter relationship with Chava.  *Sheikh v. Repub. of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020) (cleaned up).  At least one other judge in this district has relied on those factors to award $2.5 million to children of a surviving parent.  *See id.*  The Court will follow suit given the particularly damaging effects of Chava's injuries on Tehila.  The Court thus will award Tehila $2.5 million for her distress at Chava's injuries and $1.25 million for her distress at Pdaya's injuries.  All told, she will receive $10 million in solatium, $15 million overall.

*Pdaya Mark*.  Pdaya seeks $4 million for pain and suffering.  *See* Mot. at 47.  He was 15 when the attack occurred.  *See* Friedman Report on Pdaya at 1.  Pdaya remembers seeing "a lot of blood and fluid" on the floor once the car had stopped.  Pdaya Dep. at 11.  His parents were unresponsive in the front seat, and Pdaya felt scared.  *See id.* at 12–13.  He also noticed Tehila's gunshot wound.  *See id.* at 14.  Pdaya suffered comparatively light injuries:  "[a] bit of shrapnel in [his] legs."  *Id.* at 15.  He knew then that his mother was alive but also knew that his father was not.  *Id.* at 16.  Doctors cleaned Pdaya's wounds and discharged him that night.  *See id.* at 18.

After the attack, Pdaya experienced nightmares and flashbacks about it.  *See* Strous Report on Pdaya at 3–4, ECF No. 30-18.  He "stopped feeling comfortable" around others and

decided to abandon all except five of his friends going forward. *Id.* at 4.  He feels that he lost his adolescence and innocence because of the attack. *See id.* at 5.  He did not complete tenth or eleventh grade and believes the attack caused him to underachieve academically. *See id.*

Pdaya suffered minimal physical injuries from the attack but experienced understandably heightened emotional trauma at the sight of his parents unresponsive in the front seat of the car. As it did for a similarly situated plaintiff, the Court will award Pdaya $3 million in pain and suffering. *See Borochov*, 2022 WL 656168, at *20.

Pdaya also seeks the same solatium award as Tehila.  He feels that he "lost his own future" once Michael died because Michael gave him security.  Strous Report on Pdaya at 3. After Michael's death, Pdaya "became apathetic and did not care about anything." *Id.*  He also believes that he lost his mother. *See id.* at 5.  They used to take shopping trips together, but those have largely ceased since her injuries. *See* Pdaya Dep. at 23.  As for Tehila, he once had a good connection with her, but they "wouldn't speak" after the shooting. *Id.* at 25.  He worries about her, given her injuries. *See id.*

The Court will award Pdaya the same amounts in solatium as it did for Tehila.  Because he was a minor when Michael died, Pdaya deserves the same 25% enhancement to the *Heiser* standard award for Michael's death.  For the same reasons as discussed for Tehila, the Court will award him $2.5 million for his anguish over Chava's injuries.  And the Court will award him $1.25 million for emotional trauma from Tehila's injuries.  Like her, Pdaya will receive $10 million in solatium.

*Rest of the Mark Children.*  The Court groups together the rest of the Mark siblings. They seek only solatium damages in these amounts: $6.25 million each for Michael's death, $6.25 million each for Chava's injuries, $1.25 million each for the injuries to Tehila, and $1.25

million each for the injuries to Pdaya.  The Court notes at the outset that its reasons for denying

Tehila's request of $6.25 million for Chava's injuries apply to all the Mark children.  And its

reasons for an enhanced award of $2.5 million also apply to every Mark child.  As catalogued

below, the Court finds that each child has shown "severe emotional difficulties" and "significant

changes in the family dynamic" from Chava's injuries to justify such an enhancement.  *Sheikh*,

485 F. Supp. 3d at 271 (cleaned up).  The Court thus will award all Mark children $2.5 million in

solatium for Chava's injuries.

Shlomi Mark was the oldest of the Mark children.  *See* Mot. at 59.  Although he died in a

motorcycle accident in 2019, his wife described the emotional toll on him from the attack.  *See*

*generally* Dep. of Yisca Mark, ECF No. 25-13.  Shlomi and his family were at a hotel in northern

Israel when they learned of it.  *See id.* at 11.  They raced to the hospital in Jerusalem.  *See id.* at

12.  A few days later, Shlomi identified Michael's body for law enforcement.  *See id.* at 34.

Shlomi was "broken" that Michael was no longer alive.  *Id.* at 42.  Michael was Shlomi's

"security in life," *id.* at 58, but Shlomi became the security for the rest of the family afterwards.

He took over the family's financial matters and acted as a confidant to his many siblings when

they need to talk with someone.  *See id.* at 44; *id.* at 21 (Pdaya describing Shlomi as a "second

dad").  He had to make sacrifices as a result—his familial obligations forced him to leave a

military position one year sooner than expected.  *See id.* at 42–43.  Shlomi hated to see his

mother in her current state and though he committed himself to her recovery, he sometimes

broke down with sadness and longed for Chava "as she used to be."  Strous Report on Shlomi at

4, ECF No. 30-21.

Shlomi's estate seeks no enhancement for Pdaya's or Tehila's injuries, and it has not

shown any aggravating circumstances to warrant an enhanced award for Michael's death.

(Recall that he was an adult at the time of Michael's death and therefore less dependent on his father.)  Thus, the Court will award his estate $5 million for Michael's death, $2.5 million for Chava's injuries, and $1.25 million each for Tehila's and Pdaya's injuries.

Shira Mark Harif is the second oldest Mark sibling and was 24 years old when the attack happened.  *See* Strous Report on Shira at 1–2, ECF No. 30-20.  She heard about the attack and realized that it coincided with her parents' travel.  She grew very worried when she called her dad eight times and got no response.  *See* Dep. of Shira Mark Harif at 16, ECF No. 25-10 (Shira Dep.).  Once she learned that he had died, she "sat and cr[ied]." *Id.* at 18.  As the oldest sister, Shira had to inform the younger children that Michael had died and that Chava would "forever look different."  Strous Report on Shira at 3.

The attack also thrust Shira into "the role of mother for her younger siblings." *Id.* at 4. The change has had consequences.  Shira experienced "emotional suffering" centered "around trying to manage family conflicts." *Id.*  Worse, she "often feels lost" without her father to guide her. *Id.* at 5.  Finally, Shira bore much of Tehila's post-attack issues.  She spent three days at the hospital after Tehila's suicide attempt, *see* Shira Dep. at 51, and, at one point, would wake up every hour to ensure Tehila did not try again, *see id.* at 54.

For Shira's anguish, the Court will award her the *Heiser* standard $5 million for Michael's death, $2.5 million for Chava's injuries, and the standard $1.25 million each for the injuries to Tehila and Pdaya.  She has shown no circumstances to justify an upward adjustment for Michael's death or for her siblings' injuries.

Netanel Mark is the third oldest of the Mark children and seeks solatium damages.  *See* Dep. of Netanel Mark at 9, ECF No. 25-7 (Netanel Dep.).  He was 23 years old at the time of the attack and served as an officer in the Israeli armed forces. *See id.*  His unit received word of the

shooting and responded immediately. *See id.* at 10.  Only when Netanel arrived did he realize that the overturned car belonged to his family. *See id.* at 11.  He saw the bullet holes in the car and Michael's uncovered corpse on the road. *See id.* at 12–13.  Netanel then jumped into the ambulance with Pdaya and rode with him to the hospital. *See id.* at 14.  Once there, Netanel saw the full extent of Chava's wounds and worried that she would not survive. *See id.* at 20–21.

The whole ordeal caused multiple emotional injuries for Netanel.  He was unable to sleep through the night, lost significant weight, and lost much of his hair from the stress.  *See* Strous Report on Netanel at 3–4, ECF No. 30-16.  Netanel used to talk with his father every day and says life is no longer the same without Michael. *See id.* at 6.  He feels that he has lost his mother "as she used to be." *Id.*  Netanel also reports that Tehila lived with him after the attack and that he spent many hours trying to heal her emotional damages from the attack. *See* Netanel Dep. at 59.

The Court will award Netanel $6.25 million in solatium for his father's injuries.  He arrived on the scene shortly after the shooting and saw Michael's corpse lying in the road.  This qualifies as an extraordinary circumstance warranting an upward adjustment. *See Thuneibat v. Syrian Arab Repub.*, 167 F. Supp. 3d 22, 52 (D.D.C. 2016) (awarding 25% enhancement when mother saw her injured daughter placed in an ambulance just after a terrorist attack); *Belkin*, 667 F. Supp. 2d at 23–24 (awarding 20% enhancement to husband who "had to view his wife's severely disfigured body shortly after [a] bombing occurred").  For the injuries to Pdaya and Tehila, the Court will award $1.25 million each, and he will receive $2.5 million for Chava's injuries.

Yehoshua Mark, age 22 at the time of the attack, is the fourth oldest Mark sibling. *See* Dep. of Yehoshua Mark at 22, ECF No. 25-12 (Yehoshua Dep.).  He heard about the attack after

spending a day with his girlfriend.  *See* Strous Report on Yehoshua at 2, ECF No. 30-23.  When

he learned that Michael had died, Yehoshua felt like his "whole world came tumbling down[.]"

*Id.* at 2.  He has experienced little stability since that time and "has lost all faith in this life and

the way that the world works."  *Id.* at 3.  He has withdrawn from social events and "has

maintained very limited contact with his family."  *Id.* at 4.  Yehoshua also used to "talk[] a lot

about everything in the world" with Chava.  Yehoshua Dep. at 26–27.  Now, he finds her

"deeply changed."  *Id.* at 29.  He also describes an "abyss" between himself and his family over

the pain they have all suffered.  *Id.* at 31.  Because of that pain, Yehoshua dropped out of three

separate college programs and developed facial tics as a coping mechanism.  *See* Strous Report

on Yehoshua at 3.  According to Yehoshua, his "whole happy family [was] gone" once the

shooting happened.  *See* Yehoshua Dep. at 39.  For his emotional distress from the shooting, the

Court will award Yehoshua the *Heiser* standard for Michael's death and the injuries to Tehila

and Pdaya.  Despite his obvious pain and grief, the Court declines to enhance any of his awards

beyond what all the Mark siblings will receive for Chava's injuries.

Miriam Mark is the next oldest Mark sibling and was 18 years old when the attack

occurred.  Dep. of Miriam Mark at 22, ECF No. 25-6 (Miriam Dep.).  At the time, she lived in a

school for students requiring "extra attention for their emotional conditions."  Strous Report on

Miriam at 1, ECF No. 30-15.  Not only did Miriam suffer from a previous trauma, she had also

used drugs as an adolescent, prompting her enrollment in the special school.  *See* Miriam Dep. at

23.  When school staff told her about the attack, "she felt that the world had collapsed beneath

her."  Strous Report on Miriam at 2.  Staff managed to calm her somewhat, but she "could not

stop screaming and crying" after she arrived at the hospital.  *Id.*  Miriam "felt alone and that

those around her did not understand her pain."  *Id.* at 4.  Michael and she enjoyed an increasingly

close connection that "suddenly ceased" with the attack. *Id.* at 3.  As for Chava's injuries, Miriam reports that Chava "[i]s not the same mother anymore." *Id.*  But the "hardest part" for Miriam has been Tehila's and Pdaya's suffering.  Miriam Dep. at 24.  She wishes that she could take their burdens for them, *see id.* at 25, and thinks often "about the fact that they're children and their lives are destroyed[,]" *id.* at 20.

To cope, Miriam increasingly turned to drugs, most notably heroin and alcohol.  *See* Strous Report on Miriam at 5.  And she attempted suicide "on several occasions" in ways that were "more frequent and more intense" than her pre-attack attempts. *Id.*  This led Miriam to check herself into psychiatric hospitals and institutions.  *See* Miriam Dep. at 28.  Israeli social services agencies recognize her as "100%" unable to work and "50%" disabled from emotional conditions.  Strous Report on Miriam at 5.  Miriam acknowledges that her issues predate the attack, but Dr. Rael Strous, Plaintffs' psychological expert, reports that the attack "worsen[ed] [ ] her underlying anxiety and PTSD." *Id.* at 8.

Other than for Chava's injuries, the Court will award Miriam the standard *Heiser* amounts for solatium.  To be sure, other courts have awarded enhancements to plaintiffs who "turned to self-destructive behavior to cope with [the] pain" over a family member's death. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011). Miriam, however, had similar issues before the attack.  *See* Netanel Dep. at 62.  She admitted that she had abused drugs since age 12, which forced her into the facility where she lived at the time of the shooting.  *See* Miriam Dep. at 23.  The Court acknowledges her statement that she abused substances "a lot more after the attack."  *See id.* at 28.  But as her pre-attack behavior was similar, the Court cannot find that the post-attack substance abuse warrants an *upward* enhancement.  By all accounts, Miriam had engaged in self-destructive behavior already.  That

said, the Court acknowledges her trauma and applauds her for overcoming her addictions.  *See id.* (noting that she has been off drugs and alcohol for a year and two months).  But those pre-existing addictions and abuses do not justify an enhanced damages award.  And as an 18-year-old living outside the home at the time, she is not entitled to an enhanced award based on her age or cohabitation with a deceased parent.  The Court therefore will award Miriam the *Heiser* standard amounts for Michael's death and the injuries to Pdaya and Tehila.  She will also receive the enhanced award of $2.5 million that her siblings received for loss of solatium with Chava.

Orit Mark Ettinger was 16 years old at the time of the attack.  *See* Strous Report on Orit at 2, ECF No. 30-17.  On that day, she did not join her parents on their trip and instead stayed home with her two youngest siblings.  *See id.*  In the afternoon, one of her cousins suddenly arrived at the house and told her what had happened.  *See id.*  She knew she had to be strong for her younger siblings.  *See id.*  Yet the attack had lasting effects on her.  She "felt destroyed" and "lost all her structure and stability."  *Id.* at 3.  Michael was "her strength in life, her direction, and the leader of the family."  *Id.* at 5.  She "misses his guidance."  *Id.*

Orit also laments seeing Chava "completely changed."  *Id.*  According to Orit, Chava "lost her wonderful warm and nurturing character" after the attack.  *Id.*  "[H]er mother is not who she used to be."  *Id.*  Around the time of the attack, Orit also developed diabetes, which requires multiple in-body machines to monitor her glucose levels.  *See id.* at 3–4.  One physician who examined Orit concludes that her diabetes is "causally related" to the stress she felt after the shooting.  Friedman Report on Orit at 6, ECF No. 30-4.

Because Orit was a minor when she lost Michael, the Court will award her $6.25 million in solatium for his death.  *Accord Selig*, 573 F. Supp. 3d at 75.  For the injuries to her other

family members, the Court will award $2.5 million for Chava's injuries and $1.25 million each for Pdaya's and Tehila's injuries.

R.L.M. was ten years old when the attack happened.  *See* Strous Report on R.L.M. at 2, ECF No. 30-19.  When she heard about it, "[s]he froze up and felt overwhelmingly stressed."  *Id.* She was also "extremely scared."  *Id.*  Before the shooting, she had "an extremely close relationship" with Michael, often playing and learning together.  *Id.* at 3.  To not have him around has been a "life changing event."  *Id.*  And although Chava survived, R.L.M. found her "detached" and reports that their relationship "changed completely."  *Id.*  As a result, R.L.M. moved in with Shira but still felt the shooting's effects.  R.L.M. "moved schools several times" and is uncomfortable in social situations.  *Id.* at 4.  She often wonders how her life could be different "had she not lost both parents."  *Id.*  R.L.M. "misses her family the way [ ] it used to be" and sees "nothing positive" in her life.  *Id.*  For her emotional injuries the Court will award her $6.25 million for Michael's death because she was a minor at the time.  *Accord Selig*, 573 F. Supp. 3d at 75.  She will receive $2.5 million for the injuries to Chava and $1.25 million each for the injuries to her siblings.

Lastly of the Mark children, E.B.M. was eight years old when the attack happened.  *See* Strous Report on EBM at 2, ECF No. 30-14.  When she heard of Michael's death and Chava's injuries, E.B.M. "could not process all this information," but she understood soon after "that her life was about to significantly change."  *Id.*  She was right.  In the two months before she returned to school, "[e]verything was in a state of upheaval."  *Id.* at 3.  She had no parents at home and her siblings had "problems between them as to who was to care for her."  *Id.*  In short, "[s]he was no longer a regular child."  *Id.*  E.B.M. misses her father and the connection she as the youngest child had with him.  *See id.*  And because of Chava's injuries, their relationship "is

completely different now." *Id.*  More broadly, however, "her relationship with her family is also completely changed." *Id.*  She sees them "less and less" and feels that because of the attack the family "is not so close anymore." *Id.*  For these emotional injuries, the Court will award her the same amounts as it does for R.L.M.

*Chava's Family*.  Along with the Mark children, Chava's family members seek solatium damages for her injuries.

Her mother, Ayelet Batt, went into "an immediate state of shock" when she heard about the shooting.  Strous Report on Ayelett at 2, ECF No. 30-11.  Ayelet was worried about her daughter's condition, and "it was difficult for [her] to see these dramatic changes in [Chava]." *Id.* at 3.  Ayelet "suffered from an ongoing fear" that Chava might die from her injuries and worries now that Chava's emotional changes might signify that she is "losing her mind." *Id.*  These effects of the attack left Ayelet "depressed," particularly in the morning when it was time to get up. *Id.* at 4.  She "pushed herself to continue functioning," but she had little appetite and lost considerable weight. *Id.*  She also lost her willingness to pray. *See id.*  For her, "[l]ife has never been and will never be the same since the terror attack." *Id.* at 5.

For her emotional trauma, Ayelet seeks $6.25 million. *See* Mot. at 62.  She reasons that because of the injuries and changes to Chava's personality, the Court should treat Ayelet as having lost a daughter, thus triggering the $5 million standard award. *See id.*  Ayelet then asks for a 25% increase because the attack caused retraumatization from a prior terrorist attack on her grandson. *See id.*; *see also Est. of Hirshfeld*, 330 F. Supp. 3d at 107.  The Court declines to award these enhancements.  Chava remains alive and thus the applicable *Heiser* standards are those for injured family members.  And although the Court recognizes Ayelet's trauma from two

terrorist attacks, the Court can only compensate her injuries from *this* attack.  A standard award of $2.5 million in solatium will do so.

Chava's sister, Elisheva Hirshfeld, also seeks solatium.  She "was devastated" when she heard about the attack on Michael and Chava.  Strous Report on Elisheva at 4, ECF No. 30-13. Elisheva particularly felt the sting of the attack because her son had died in a 2008 terror attack at his high school in Jerusalem.  *See Est. of Hirshfeld*, 330 F. Supp. 3d at 148 (receiving $5 million in solatium for son's death).  The shooting brought those memories back for Elisheva. *See* Strous Report on Elisheva at 4.  To make herself "present and available" for Chava, Elisheva did not return to her job.  *Id.*  Supporting Chava has also forced Elisheva to "neglect[] other important aspects of her life such as her husband and children."  *Id.* at 5.  For months she would travel into Jerusalem for Chava's rehabilitation therapy.  *See id.* at 5.  Elisheva "misses her sister as she used to be[,]" and "has remained immeasurably sad" in the years since the attack that injured Chava.  *Id.*

Elisheva requests $3.125 million in solatium.  *See* Proposed Order at 4.  Like Ayelet, she assumes the standards for deceased victims as a baseline and seeks an enhancement.  *See* Mot. at 62.  As with Ayelet, the Court will not award those amounts, opting instead for an award of $1.25 million consistent with the *Heiser* framework.  Indeed, an award of $3.125 million would exceed the award given to Chava's children who, unlike her extended family, live with her.

Chava's brother, Aryeh Batt, seeks solatium damages.  When he heard about the attack, Aryeh could not confirm Chava's condition.  *See* Strous Report on Aryeh at 2, ECF No. 30-9. He feared that she was dead because nobody had told him otherwise.  *See id.*  He sped to the hospital, where he saw Chava as she awoke from surgery.  *See id.*  It was "touch and go whether she would live."  *Id.*  After that, Aryeh could not process or mourn Chava's injuries because her

children "needed assistance from a responsible older close family member [like] him to keep them all together." *Id.* at 3.  Aryeh has continued that assistance, traveling often to meet with doctors about Chava's recovery and pleading with Israeli officials to pay for some of her surgeries.  *See id.* at 4–5.  This leaves him with less time for friends and sleep.  *See id.* at 5. Overall, Aryeh struggles to see his sister's personality and behavior change after her injuries. *See id.* at 3.  "[S]he was not the same sister that he knew."  *Id.*  As for Elisheva, the Court will award Aryeh $1.25 million in solatium for his emotional trauma.

Finally, Chava's other brother, Avi Batt, seeks solatium.  When Avi heard about the attack, he traveled to Jerusalem to be with his mother.  *See* Strous Report on Avi at 2, ECF No. 30-10.  Avi worried about Chava's condition and "was overwhelmed by fear and trepidation that he was about to lose his sister."  *Id.*  Of the siblings, Avi was closest to Chava.  They spoke every day for many years and "share[d] their lives with each other."  *Id.* at 3.  That has all ceased.  Because Chava "is not the same person she used to be," he has lost their "close relationship."  *Id.*  More, Avi has lost his "happy go lucky nature" since the attack; "everything has become tinged with loss and family stress."  *Id.* at 5.  Consistent with his siblings, the Court will award Avi $1.25 million.

*   *   *

The Court pauses to note that, in distinguishing between Plaintiffs and setting awards, it does not minimize or denigrate the pain and suffering each Plaintiff has endured.  No one should experience the trauma that they experienced.  The Court's awards are driven by a recognition that most—if not all—people eligible for damages from a terrorist attack have suffered the unimaginable.  *Accord Selig*, 573 F. Supp. 3d at 75.  In the end, a court's rulings must be

36

grounded in the law, not sympathy or instinct.  The Court's awards here reflect that law and an individualized assessment of the record as to each Plaintiff.

### E.  Punitive Damages and Costs

Plaintiffs also seek punitive damages, which apply not to compensate victims but to "punish outrageous behavior and deter such outrageous conduct in the future."  *Kim v. Dem. People's Repub. of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (cleaned up).  Four factors are relevant in deciding the appropriate level of punitive damages:  "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Est. of Steinberg v. Islamic Repub. of Iran*, No. 17-cv-1910 (RCL) 2019 WL 6117722 at *9 (D.D.C. Nov. 18, 2019) (cleaned up).

These factors support an award of punitive damages here.  Iran's acts were heinous.  Their support of Hamas was intended to—and did—cause unconscionable pain and suffering.  Deterrence is necessary because, time and again, courts in this district have been confronted with families shattered by Iran-backed terrorists.  *See, e.g.*, *Wultz v. Islamic Repub. of Iran*, 864 F. Supp. 2d 24, 42 (D.D.C. 2012) (awarding punitive damages based on "the extreme reprehensibility" of Iran's acts).  To calculate punitive damages here, Plaintiffs ask the Court to multiply each compensatory award by three.  *See* Mot. at 41.

The Court has recently rejected this approach to punitive damages.  *See Selig*, 573 F. Supp. 3d at 76.  "A minority of judges in this jurisdiction follow [it]," and some courts have found it appropriate only in "a special circumstance."  *Id.* (citing *Abedini*, 422 F. Supp. 3d at 142).  Instead, the Court will award punitive damages equal to compensatory damages—$141.25 million.  Several judges in this district have employed the same approach.  *See, e.g.*, *Hekmati v.*

*Islamic Repub. of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017); *Flanagan*, 87 F. Supp. 3d at 124–25; *Moradi*, 77 F. Supp. 3d at 73.  This Court has twice awarded punitive damages equal to compensatory ones to accommodate the unique characteristics of a terrorist attack.  *See Selig*, 573 F. Supp. 3d at 77 ("This case is not like those involving hundreds of decedents murdered in a bombing. The deaths here, while no less tragic, were fewer in number." (cleaned up)); *Borochov*, 2022 WL 656168, at *22–*23 (same).

Thus, the Court awards punitive damages of $141.25 million, to be apportioned among Plaintiffs according to their compensatory damages, for the reasons more fully discussed in *Selig*.  *See* 573 F. Supp. 3d at 77 (apportioning punitive damages in this way).

*Costs, Expenses, and Attorneys' Fees*.  The last category of damages sought by Plaintiffs is their "costs and expenses" and their "attorneys' fees."  Compl. ¶ 133(c) and (d).  But Plaintiffs cite no basis for the award of these fees.  *See Kinyua v. Repub. of Sudan*, 466 F. Supp. 3d 1, 13 (D.D.C. 2020) ("[T]he Court is not aware of any statutory or other basis for the award of attorney's fees[.]").  More, "plaintiffs have not provided any information regarding the fees and costs sought."  *Aceto v. Islamic Repub. of Iran*, No. CV 19-464 (BAH), 2020 WL 619925, at *23 (D.D.C. Feb. 7, 2020) (denying plaintiffs' request for "reasonable costs and expenses" because "plaintiffs have not provided any information regarding the fees and costs sought") (cleaned up).  The Court therefore declines to award any fees or expenses.

## V.  CONCLUSION

For these reasons, Plaintiffs' Motion for Default Judgment will be granted in part and denied in part.  A separate Order will issue.

Dated: September 8, 2022                       TREVOR N. McFADDEN, U.S.D.J.